The **MUNICIPAL DISTRIBUTORS GROUP et al., Petitioners,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

Brooks Gas Co., Inc., and Cities Service Gas Company, Intervenors.

No. 24820.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 27, 1972.

Decided July 27, 1972.

Mr. Charles F. Wheatley, Jr., Washington, D. C., with whom Grace Powers Monaco, Washington, D. C., was on the brief, for petitioners.

Mr. Michael J. Manning, Atty., F. P. C., with whom Messrs. Gordon Gooch, Gen. Counsel, J. Richard Tiano, Asst. Sol., and George P. Lewnes, Asst. Gen. Counsel, F. P. C., were on the brief, for respondent.

Mr. Harold L. Talisman, Washington, D. C., with whom Mr. Harry S. Littman, Washington, D. C., was on the brief, for intervenor Cities Service Gas Co.

Mr. Paul Y. Seligson, Washington, D. C., entered an appearance for intervenor Brooks Gas Co., Inc.

Before MacKINNON and ROBB, Circuit Judges, and MATTHEWS,* Senior District Judge, United States District Court for the District of Columbia.

MacKINNON, Circuit Judge:

The Municipal Distributors Group (MDG), eight small municipalities located in central Missouri, brings this petition for review [1] of two orders of the Federal Power Commission in their consolidated proceedings in Cities Service Gas Company, Docket Nos. CP67–340, et al.[2] We find that the Commission's orders were based on substantial evidence in the administrative record, and were otherwise proper. Accordingly, for the reasons set forth below, we affirm those orders.

## I. BACKGROUND AND COMMISSION ACTION

Cities Service Gas Company (Cities) is a natural gas pipeline company operating primarily in Kansas and western Missouri. On May 16, 1967 Cities filed a request with the Commission under Section 7(c) of the Natural Gas Act, 15 U.S.C. § 717f(c) (1970), for a certificate of convenience and necessity to construct a major extension of their pipeline system to serve 38 municipalities and three direct industrial customers in central Missouri. FPC Docket No. CP67–340. The project contemplated construction of a 38.4 mile 20-inch pipeline looping a portion of Cities' existing 16-inch line between its Saginaw Station and Springfield, Missouri, in the southwestern corner of the state; a new compressor station near Springfield; 182.5 miles of main transmission line extending in a generally northeasterly direction from Springfield to Washington, Missouri; and 192.6 miles of lateral lines to serve the various communities and industrial customers in the vicinity of the new transmission line. (A map of this proposal is printed as an Appendix to this opinion.) Cities' financial projections included an estimated $15.4 million in construction costs, to be largely financed by long-term debt bearing an approximately 5.75% interest rate. Cities' proposal, as amended, was to create a new Rate Division 3, averaging 58.5¢ per Mcf for firm service. Existing customers in western Missouri were included in Cities' Division 2, with rates averaging 23.5¢ per Mcf lower than the proposed rates for this new service.

Several applications under Section 7(a) of the Act [3] were filed, all of which

---

* Sitting by designation pursuant to 28 U.S.C. § 294(c) (1970).

1. The petition is brought under Section 19 (b) of the Natural Gas Act, 15 U.S.C. § 717r(b) (1970).

2. The two orders are: (1) Order Denying Certificate of Public Convenience and Necessity, Approving and Denying Certain Other Applications, and Ruling on Lateral Line Policy, issued July 27, 1970;

and (2) Order Denying Rehearing, issued September 21, 1970. They may be found in the two-volume Joint Appendix to the briefs submitted by the parties on this appeal at Vol. II, pp. 623–26, 638–41 (hereafter cited as I or II JA).

3. Section 7(a) of the Natural Gas Act, 15 U.S.C. § 717f(a) (1970) provides a mechanism by which "persons" or "municipalities" (as defined by the Act) can

were consolidated with the proceedings in Docket No. CP67–340. In addition to MDG's application, two others are relevant here. In Docket No. CP67–385, the Cities of Rogersville, et al., applied for a Section 7(a) order directing Cities to construct approximately 186 miles of pipe facilities to serve Rogersville and 13 other communities in south-central Missouri. The Secretary of the Army, in Docket No. CP69–80, also applied for a Section 7(a) order to provide natural gas service to Fort Leonard Wood, located approximately mid-way between Cities' proposed transmission line and the Rogersville group of communities.

The MDG application, Docket No. CP68–227, the denial of which is the subject of this appeal, proposed for the Commission's consideration two alternatives to Cities' requested project. Motivated primarily by the desire to obtain natural gas at rates lower than those in Cities' proposed Division 3 rate schedule, the MDG application was premised on bringing gas to a much larger market than that envisoned by the Cities plan.[4] Alternate I of the MDG application proposed routing Cities' pipeline extension almost due east from Saginaw through the Rogersville communities, thence north through Fort Leonard Wood, then turn northeast along the same trace as the Cities proposal. (See Appendix for map.) Lateral lines off this re-routed line would serve all the same customers as the Cities plan, as well as meet the Rogersville group and Army requests for gas service. Under Alternate I, the primary line would extend 267 miles, and 311 miles of laterals would be constructed. Of the total estimated cost of $20.1 million, Cities would bear nearly $18 million, with the remainder coming from capital contributions from 18 of the communities to be served. MDG's Alternate II proposal, offered in the event Cities' application was either withdrawn or denied, requested a Section 7(a) order to Cities to sell and deliver gas at either Saginaw or Springfield to a pipeline following the same general trace as Alternate I. (See Appendix for map.) This pipeline was to be built, owned, and operated by the consuming municipalities themselves. This project was to be smaller in scope than Alternate I, serving only the MDG, Fort Leonard Wood, and those of the Rogersville group willing and able to participate.

After consolidating all the applications and holding a prehearing conference on October 16, 1968, the hearing was set for March 18, 1969 and ran

obtain supplies of natural gas from transmission lines in their area, even if the transmission company is unwilling to contract with these municipalities or persons to provide the gas. Central Ill. Pub. Serv. Co. v. FPC, 338 F.2d 682, 686–687 (7th Cir. 1964). The full text of Section 7(a) is as follows:

(a) Whenever the Commission, after notice and opportunity for hearing, finds such action necessary or desirable in the public interest, it may by order direct a natural-gas company to extend or improve its transportation facilities, to establish physical connection of its transportation facilities with the facilities of, and sell natural gas to, any person or municipality engaged or legally authorized to engage in the local distribution of natural or artificial gas to the public, and for such purpose to extend its transportation facilities to communities immediately adjacent to such facilities or to territory served by such natural-gas facilities or to territory served by such natural-gas company, if the Commission finds that no undue burden will be placed upon such natural-gas company thereby: *Provided*, That the Commission shall have no authority to compel the enlargement of transportation facilities for such purposes, or to compel such natural-gas company to establish physical connection or sell natural gas when to do so would impair its ability to render adequate service to its customers.

4. The central Missouri area is one of the few parts of this country wholly without natural gas service. By expanding the area to be served by Cities' project, more of this gap in gas service would be filled. With more users and a correspondingly greater volume of consumption from these new facilities, the unit cost and presumably Cities' rates would be reduced.

through 29 days of testimony to May 7. The Presiding Examiner's opinion issued on December 10, 1969. He found the omission of service to Fort Leonard Wood to be a major defect in Cities' application, and he noted that rising interest rates posed a significant problem with regard to Cities' financial projections. He ruled, however, that Cities should be given the opportunity to revise its application to cure these defects. All the other applications relevant here were denied. Exceptions to the Examiner's decision were filed, including a statement from Cities concurring with his evaluation of the project's financial problems and stating that they did not wish to proceed with the project and would not revise their application.

On July 27, 1970 the Commission issued a brief order that largely adopted the findings and conclusions of the Examiner. Acceding to Cities' unwillingness to proceed with the project and their failure to revise their application to conform to the Examiner's conditions, the Commission found that they had "no alternative but to deny Cities' project application, as well as the several 7(a) applications which are predicated upon it." II JA at 624. Alone among the 7(a) applicants, the MDG filed a petition for rehearing before the Commission. The Commission's order denying

rehearing was issued on September 21, 1970. In this case the MDG petitions us for review of the Commission's July 27 and September 21 orders. We granted Cities Service leave to intervene.

## II. THE ALTERNATE I PROPOSAL

 Though the parties have disagreed at various stages of these proceedings about the precise scope of the Alternate I proposal, it now seems reasonably clear that MDG intended at least two distinct requests to be encompassed therein. The first of these was a request for the Commission to exercise its power under Section 7(e) of the Act [5] to impose as a condition to any certificate issued to Cities pursuant to their Section 7(c) application the requirements that the project follow the route proposed by MDG and provide natural gas service to the communities included in the MDG proposal. It is conceded by the parties here that Section 7(e) does grant the Commission power to so condition a certificate where necessary to more adequately meet the requirements of public convenience and necessity.[6] However it is also conceded that this power extends only to certificates issued to Section 7(c) applicants "willing . . . to perform the service proposed."[7] The Commission noted in

---

5. Section 7(e), 15 U.S.C. § 717f(e) (1970), provides as follows (emphasis added) :

 (e) Except in the cases governed by the provisos contained in subsection (c) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and neces-

sity ; otherwise such application shall be denied. *The Commission shall have the power to attach it to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require.*

6. *See* FPC v. Hunt, 376 U.S. 515, 525–527, 84 S.Ct. 861, 11 L.Ed.2d 878 (1964) ; Atlantic Ref. Co. v. Public Serv. Comm'n of New York, (CATCO cases), 360 U.S. 378, 388–391, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959) ; *cf.* United Gas Improvement Co. v. Callery Properties, Inc., 382 U.S. 223, 86 S.Ct. 360, 15 L.Ed.2d 284 (1965).

7. *Cf.* Public Util. Comm'n of Conn. v. FPC, 205 F.2d 116, 120–121 (3d Cir. 1953).

its July 27 order that Cities' "enthusiasm, and indeed its willingness to proceed, have now wholly evaporated." II JA at 624. MDG does not contest the Commission's conclusion that upon this decision by Cities, the Commission's 7(e) powers similarly "evaporated."

The second request included within MDG's Alternate I proposal was for the Commission to order Cities to construct the project pursuant to Section 7(a). MDG's reliance on Section 7(a) results from Cities' unwillingness to proceed with the project. As the Examiner observed, "The very purpose of [§ 7(a)] must be to compel pipelines to build when they do not want to. Otherwise it would have no effect." [8] Here again, however, two separate theories of entitlement to a § 7(a) order were argued, resulting in the confusion and disagreement noted at the beginning of this portion of our opinion. The confusion is due to the fact that though the theories are analytically distinct, MDG's presentation of them was substantially less than lucid, and the factual findings upon which the Commission appears to have based its rejection of both theories are approximately the same.

The Examiner dealt primarily with the contention that construction of MDG's Alternate I proposal could be compelled pursuant to the "lateral-line"

provision in Cities' tariff.[9] Under that provision Cities had declared:

> As a general policy, Company will construct a sales lateral pipeline to any utility purchasing gas from Company for resale to a community or location adjacent to Company's transmission system provided: [enumerating certain rate, capacity, and financing conditions].

II JA at 601–602. MDG contended that the absence of any distance, size, or dollar limitation among these conditions made Cities' policy one based on an "economic feasibility" criterion; and that since the MDG communities had alleged their willingness to contribute sufficient funds to make the project "feasible" within Cities' financial criteria, the Commission should order construction under these provisions. The Examiner denied this contention,

> first, because of the expressed limitation of the policy to lines extending to locations adjacent to Cities' transmission system and, as a second and independent ground, because a lateral-line policy, regardless of expressed limitations, is applicable only to laterals and this is not a lateral, but a main line extension.[10]

He relied on several facts to support these conclusions: (1) If the project

---

8. II JA at 564; see Central Ill. Pub. Serv. Co. v. FPC, 338 F.2d 682, 687 (7th Cir. 1964).

9. A pipeline company's "lateral-line" policy declares its conditions for entering agreements with potential users (e. g. municipalities wishing to operate their own distribution systems) located in areas adjacent to the pipeline, concerning construction of connecting facilities between the user and the pipeline and concerning delivery of gas supplies. Noting that pipelines were frequently rather arbitrary and discriminatory in their contracts with such users, the Commission in Order No. 328, 36 F.P.C. 774 (1966), ordered pipelines to adopt a definite lateral-line policy and publish it as a part of their tariff. Cities had previously followed a policy of not contributing to lateral-line construction, but on January

5, 1967 they filed a tariff modification that prescribed certain conditions and financial limits under which they would construct sales laterals. Cities subsequently changed this policy back to its former position, with the tariff change embodying this reversal taking effect October 1, 1968. One of the issues in this proceeding had been whether Cities' lateral-line tariff applied to these applications. The uncontested finding of the Examiner and the Commission was that it did apply.

10. II JA at 565. In Order No. 365, issued July 8, 1968, the Commission had defined the term "sales lateral" as "any pipeline extension (other than a main line extension) built from an existing pipeline facility to deliver natural gas to one or more customers." 40 F.P.C. 46, 49 (1968).

were presumed to be a lateral line, the main line must be presumed to end at Springfield, which is, in any normal meaning of the word, "adjacent" to only a small portion of the project. Though he eschewed any attempt to define how long a "lateral" might be, or how far away an "adjacent" customer might be, he considered it "plain that no stretch of the meaning of the word 'lateral' would embrace" a project of this magnitude. (2) the line referred to by MDG as the "main sales lateral" from which "branch laterals" were to serve the customer communities just simply did not "deliver natural gas" to any customer other than Fort Leonard Wood, thus strongly suggesting it should be considered a "main line extension" instead of a "lateral." (3) The 16-inch segment from Saginaw to Springfield served no customers, duplicated an existing Cities line, and was apparently necessary solely to increase the capacity of Cities' pipeline at Springfield. This could not conceivably fall within the definition of a "lateral," and may well have constituted an "enlargement" of Cities' facilities that would take the project wholly outside the Commission's power to compel construction under Section 7(a). (4) The scope of the project would necessitate a major financing by Cities, a result wholly inconsistent with the common understanding of a lateral-line policy.

The second theory urged by MDG was that the Commission need not rely on Cities' lateral-line policy since Section 7(a) provides the Commission with authority to

> direct a natural-gas company to extend or improve its transportation facilities, to establish physical connection of its transportation facilities with the facilities of, and sell natural gas to, any person or municipality engaged or legally authorized to engage in the local distribution of natural or artificial gas to the public. . . .

15 U.S.C. § 717f(a) (1970). In the *proviso* to Section 7(a), however, the Commission is deprived of authority to "compel the enlargement of transporta-

tion facilities for such purposes." *Id.* The relationship between these two segments of the statute has apparently never been satisfactorily resolved. The question, in each case, is whether the requested project

> constitutes on the one hand a mere extension or improvement, concededly within the power of the Commission to direct, or an enlargement which the Commission may not order. The Act nowhere defines these terms and it is somewhat baffling to determine when and under what circumstances an extension or improvement of facilities ceases to be such and becomes enlargement.

Michigan Consolidated Gas Co. v. Panhandle Eastern Pipe Line Co., 173 F.2d 784, 788 (6th Cir. 1949). The Examiner went no further than stating this question, finding it

> unnecessary to reach the statutory question because the lateral-line policy has no application to such a project and cannot properly be invoked in support of it. In his [the Examiner's] view, therefore, the Commission need not make a statutory interpretation that might tend to limit its jurisdiction.

II JA at 563–64. Neither of the Commission's orders appealed from here makes any explicit reference to the question, having apparently adopted the Examiner's view that such a determination was unnecessary.

It has long since been accepted as a commonplace in administrative practice that "the orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained." SEC v. Chenery Corp., 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943). But while recognizing that "an agency or commission must articulate with clarity and precision its findings and the reasons for its decisions," we also have acknowledged that the presumption of regularity and principles of judicial restraint induce an

indulgence "toward administrative action to the extent of affirming an order where the agency's path can be 'discerned' even if the opinion 'leaves much to be desired.'" WAIT Radio v. FCC, 135 U.S.App.D.C. 317, 320, 418 F.2d 1153, 1156 (1969), quoting from Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 595, 65 S.Ct. 829, 89 L.Ed. 1206 (1945). Summarizing the court's supervisory function in the total administrative process, we recently stated:

> If satisfied that the agency has taken a hard look at the issues with the use of reasons and standards, the court will uphold its findings, though of less than ideal clarity, if the agency's path may reasonably be discerned, though of course the court must not be left to guess as to the agency's findings or reasons.

Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971). The problem confronting us here, then, is to determine whether the Commission's failure to clearly and precisely articulate its findings and reasons for rejecting MDG's Section 7(a) request requires us to impermissibly guess at their rationale, or whether their path toward that decision may be reasonably discerned from the record before us.

▆ The Commission contends, at the outset, that MDG has raised this issue for the first time on this appeal, and, having not presented it before the Commission in the proceedings below, MDG cannot here complain of the Commission's failure to resolve it. MDG responds with citations to and quotations from its application, its initial brief before the Examiner, Cities' brief before the Examiner, its exceptions to the Examiner's decision, and its petition for rehearing. Coupled with the Examiner's acknowledgement of the issue (quoted above) by deciding he need not deal with it, we cannot accept the Commission's position. However, from our examination of the overall context of the passages cited to us by MDG, it becomes obvious that MDG never presented a sharply focused § 7(a) argument independently of its lateral-line argument. For example, MDG refers us to that portion of its petition for rehearing in which they argued:

> 5. Neither the Commission nor the Examiner determined, on the merits, consistent with statutory obligation and authority under Section 7 of the Natural Gas Act, whether Cities route best met the public interest or whether an alternative would best serve the public interest. . . . The Examiner's failure to consider the merits of the comprehensive First Alternative presented by MDG apparently stemmed from his opinion that the Commission lacks legal authority to certificate any location other than Cities proposal as an "enlargement" contrary to the proviso of Section 7(a). . . . The proviso in Section 7(a) does not preclude the Commission from finding that new proposed facilities are inadequate, or improperly located, or that they should serve more communities. The extension or modification of proposed facilities by the Commission to meet the public interest is perfectly proper.

Reply brief for petitioner, at 6 n. 13, quoting from II JA at 632–33. This passage is not without ambiguity; it might be read either to urge a § 7(a) order, as MDG argues here, or to request imposition of conditions pursuant to § 7(e) on any certificate granted to Cities. However, this portion of the MDG petition for rehearing concludes with a passage that would seem to preclude the first of these interpretations:

> Except to the extent that it is required by the lateral line provisions of Cities' tariff, none of the parties argue for an order compelling Cities to accept a certificate conditioned by the Commission to meet the requirement of the public interest for serving the Central Missouri area. If Cities can and does refuse to accept such a

certificate, the Commission should authorize MDG's Second Alternate.

II JA at 633. MDG refers us to no portion of the record where their § 7(a) argument is clearly and precisely articulated without encountering similarly ambiguous or contradictory contextual material. Under these circumstances we find it exceedingly difficult to fault the Commission for failing to articulate their denial of this argument.

Yet we need not rest there. Without improperly guessing, and without building a "post-hoc rationalization" [11] for the Commission's action, we believe that we can reasonably discern the Commission's path through this record, and we find that path to have led to a legally permissible conclusion supported by substantial evidence in the record.

 In making its request for a Section 7(a) order, MDG had clearly argued entitlement under the lateral-line tariff provision and, as we have described above, hinted at entitlement under the statute alone. Although the Commission, to our knowledge, has never considered the question, and without pretending to pre-determine such a question whenever properly brought before the Commission, we would consider it reasonable as a matter of law for the Commission to apply different standards to requests such as were made here. A lateral-line tariff provision represents an affirmative undertaking by the pipeline company to construct facilities to accommodate potential customers under specified conditions. A Section 7(a) order compelling adherence to such a provision is thus not much more than Commission enforcement of the pipeline's prior agreement to build. A Section 7(a) order under the statute alone represents a pure exercise of governmental power on behalf of the potential customer to coerce construction by an unwilling pipeline. We do not believe it would be at all unreasonable for the Commission to demand a far more rigid standard of

necessity and convenience from a § 7(a) applicant relying solely on the statute than on an applicant seeking enforcement of a tariff provision. Viewed in this context, the Examiner's finding that it was "unnecessary to reach the statutory question because the lateral-line policy has no application to such a project and cannot properly be invoked in support of it," is reasonable on either of two grounds: (1) The lateral-line question was the sole issue squarely presented, and its resolution obviates the necessity to go any further; or (2) since an even stronger showing would be necessary to establish the statutory claim than the tariff claim, resolution of the lateral-line question against MDG obviates the necessity to consider the other.

 The Commission's resolution of the Alternate I proposal carries the Examiner's reasoning one step further. At the time of the Examiner's decision MDG's Alternate I project, and the other § 7(a) applications, remained viable *if* Cities were willing to proceed with the project under the conditions proposed by the Examiner. Even if some route other than MDG's proposed route were followed, the Section 7(a) requests might have been construed and approved by the Commission as requesting such modifications to the Cities proposal as would result in service to all the communities included within the MDG Alternate I proposal. But then Cities declared its intention not to proceed with the project, and the Commission's July 27 order stated "we have no alternative but to deny Cities' project application, as well as the several 7(a) applications which are predicated upon it. Thus we also deny, because they have become moot, the applications of . . . the [MDG] in its Alternate I. . . ." II JA at 624. It seems reasonably clear that the Commission had accepted the Examiner's findings in regard to the lateral-line policy and that therefore the

11. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168–169, 83 S.Ct. 239, 9 L. Ed.2d 207 (1962).

only remaining § 7(a) argument was that "predicated upon" some modified project Cities might be willing to construct. This rationale was reiterated in the September 21 order denying rehearing:

> (2) The [MDG's] Alternate I, being predicated upon the construction of facilities by Cities in central Missouri, became moot when Cities indicated that it was unwilling to construct any facilities in that area. *Alternate I does not stand on its own feet.* . . .

II JA at 639 (emphasis added). While this conclusion, that Alternate I cannot survive independently from the Cities project, "leaves much to be desired" in the way of a reasoned articulation of the Commission's findings, we can reasonably discern their path (1) through the Examiner's adverse findings on the 7(a) and lateral-line questions, (2) to the dependence of the project on Cities' willingness to proceed, (3) to the final decision of mootness. The Commission's decision with regard to Alternate I may thus be affirmed.

### III. THE ALTERNATE II PROPOSAL

The Commission's rejection of MDG's Alternate II proposal poses no similar problem in regard to clarity or articulated findings. In its July 27 order the Commission stated:

> The Examiner correctly, in our view, detailed defects in the [MDG] plan which have not been overcome. There is uncertainty as to precisely what communities would participate, what ownership interests each would have, what operation and maintenance responsibilities each would assume, how new communities might be accommodated, whether financing (even under a new Missouri 8% ceiling) is realistically available, and at what price natural

gas could be purchased. In the circumstances, we cannot find that the [MDG] second alternate is required by the present or future public convenience and necessity.

II JA at 624–25. Following MDG's petition for rehearing, the Commission's September 21 order reiterated its previous finding that the uncertainties surrounding the project made its success too doubtful to warrant authorization:

> Notwithstanding a plethora of evidence from the [MDG], our view is that uncertainty remains. By way of examples, the record is unclear as to what communities will actually and actively participate; it is wholly muddled as to the ownership interests of the communities; operating and maintenance responsibilities are unsettled; and although the joint venturers would undoubtedly welcome further participants, with the probable effect of reducing proportionate costs, there is no indication as to the terms on which this would be accomplished.

II JA at 640.

MDG's argument here proceeds along two separate lines: (1) several of the specific matters found by the Commission to be impermissibly uncertain—*e. g.* ability to finance the project, operation and maintenance plans, and ownership interests—are matters of purely local governmental concern outside the jurisdiction of the Commission; (2) the Commission's findings of uncertainty are not supported by the record.

▇ The first of these arguments is premised on the fact that the MDG is not a "natural-gas company" within the definition of the Natural Gas Act,[12] and therefore its operation of the pipeline system proposed in this alternative would not be under the jurisdiction of the Commission.[13] There is some author-

---

12. 15 U.S.C. § 717a(6) (1970) defines a "natural-gas company" as an individual or corporation "engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale."

13. The Commission's jurisdiction extends only
 to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consump-

ity for their position that the Commission may not properly inquire into matters of local law [14]—such as ownership interests and operation and maintenance responsibilities—in determining whether to grant a Section 7(a) application to a local distribution system. But however that question may be answered in some contexts,[15] we are convinced that in the context of this case the Commission would have seriously abrogated their responsibility to protect the public interest if they were to grant an application for a venture whose prospects are as seriously clouded by uncertainty and doubt as that presented here. This Section 7(a) application does not present an ordinary request for inter-connection and service to a local community. Rather this application envisions the construction of a major transmission system opening a large geographical area including many local communities to natural gas service. In addition to the Commission's primary purpose under the Act to protect natural gas consumers,[16] Section 7(a) expressly requires that before ordering connection of and sales . to a municipal distribution system the Commission must find such an order to be "necessary or desirable in the public interest." The Commission would fail to meet either of these obligations if they were to approve an application as thoroughly obscured by uncertainty as the MDG Alternate II proposal. It is neither necessary nor desirable to approve an application in advance of the time that major questions concerning financing, participation, operation, and maintenance of the project are resolved. The public interest in such a project can be far more readily ascertained after such questions have been firmed up to some substantial degree. And it seems clear beyond question that the interests of the potential natural gas consumers in the area to be served, as well as the interests of the consumers presently being served by the interstate pipeline which would be ordered to provide gas to this project,[17] can best be protected when the Commission has some *firm* indications of the details of the project proposed in the application.

■■ MDG's evidentiary contention *is easily resolved upon consideration of the proper scope of our review on this appeal. We are constrained not only by the general doctrine that administrative action may not be reversed when supported by substantial evidence, but also by the explicit requirement of the Natural Gas Act that "[t]he finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive."* [18] The MDG has pointed to much evidence tending to demonstrate the feasibility of their proposed project. But the Commission has found that this evidence, when weighed against conflict*ing evidence in the record, leads only to the inference that the prospects for successful completion of the project are so*

tion for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale . . . .
15 U.S.C. § 717(b) (1970).

14. *See* Central Ill.Pub.Serv. Co. v. FPC, 338 F.2d 682, 686–687 (7th Cir. 1964), affirming American La. Pipe Line Co., 30 F.P.C. 698 (1963). The Commission and Intervenors, however, cite this same case as authority for the contrary proposition that the Commission must examine . *all* relevant factors before granting a § 7(a) application.

15. This is a question we do not consider necessary to our resolution of the case, and we therefore intend to suggest no answer here.

16. United Gas Improvement Co. v. Continental Oil Co., 381 U.S. 392, 402, 85 S. Ct. 1517, 14 L.Ed.2d 466 (1965); Atlantic Ref. Co. v. Public Serv. Comm'n of New York (CATCO cases), 360 U.S. 378, 388, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959); Mesa Petroleum Co. v. FPC, 441 F.2d 182, 186 (5th Cir. 1971); California Gas Producers Ass'n v. FPC, 421 F.2d 422, 428 (9th Cir. 1970); Cincinnati Gas & Elec. Co. v. FPC, 389 F. 2d 272, 276 (6th Cir. 1968).

17. *Cf.* FPC v. Transcontinental Gas Pipe Line Corp., 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961).

18. 15 U.S.C. § 717r(b) (1970).

darkly obscured by the veil of uncertainty that the requested Section 7(a) order would be unwarranted. It seems to us that the very existence of such broadly conflicting evidence of feasibility supports the Commission's finding of an invalidating uncertainty. We may not, therefore, reverse that finding or the Commission's consequent decision to deny approval of the requested Alternate II project.

The Commission's orders in these proceedings must accordingly be affirmed.

Judgment accordingly.

APPENDIX

CITIES SERVICE PROPOSED CENTRAL MISSOURI PROJECT

MUNICIPAL DISTRIBUTORS GROUP ALTERNATE I PROJECT

MUNICIPAL DISTRIBUTORS GROUP ALTERNATE II PROJECT