The COMMITTEE TO SAVE LAKE MURRAY, etc., Petitioner,

v.

The FEDERAL POWER COMMISSION, Respondent,

Watergate Partnership, South Carolina Electric & Gas Company, Intervenor.

James E. SMITH, Petitioner,

v.

The FEDERAL POWER COMMISSION, Respondent,

South Carolina Electric & Gas Company, Watergate Partnership, Intervenors.

Nos. 73–2271, 73–2272.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 16, 1975.

Decided June 26, 1975.

---

380

F. Glenn Smith, Columbia, S. C., for petitioners.

Arthur E. Gowran, Atty., F.P.C., of the bar of the Supreme Court of Pa., pro hac vice by special leave of court with whom Leo E. Forquer, Gen. Counsel and George W. McHenry, Jr., Sol., F.P.C., were on the brief for respondent. A. Lee Wallace, III, Atty., F.P.C., also entered an appearance for respondent.

Peyton G. Bowman, III, Washington, D. C., with whom Brian J. McManus, Washington, D. C., was on the brief for intervenors.

George Hermann Fischer, III, and Edward C. Roberts, Columbia, S. C., were on the brief for intervenor South Carolina Electric and Gas Co.

Before MacKINNON and WILKEY, Circuit Judges, and VAN PELT,* Senior District Judge for the District of Nebraska.

VAN PELT, Senior District Judge:

This case comes before the court upon the separate petitions of James E. Smith and The Committee to Save Lake Murray (hereafter called the Committee) to review an order of the Federal Power Commission (hereafter called the Commission), with one Commissioner dissenting, of September 10, 1973 approving the application of South Carolina Electric & Gas Company (hereafter called the Company) to grant an easement to the Watergate Partnership, a private real estate developer (hereafter called the Partnership). The appeal also challenged the Commission order of November 2, 1973 denying a motion for rehearing filed by Smith. Smith was the original petitioner. The Committee was permitted to intervene. Both Smith and the Committee were represented by the same counsel.

The parties are in agreement that this court has jurisdiction of the subject matter of the appeal under the provisions of 16 U.S.C. § 825e. The court on its own motion at the time of oral argument asked for further briefing upon the question of the Commission's jurisdiction.

## THE ISSUES

The issues presented are

1) Whether the Commission acted within its statutory authority in issuing the order permitting the Company to grant the easement to the partnership for the purpose of constructing and utilizing a line for the discharge of treated effluent in the project reservoir;

2) Whether the order was based upon substantial evidence;

3) Whether an easement can be granted to a private development project; and

4) Whether or not a public hearing should have been held prior to granting the easement.

By way of background it should be pointed out that the Commission issued a license on August 5, 1927 to the Lexington Water Power Company for Project No. 516. The project included the construction of an earth dam on the Saluda River, a non-navigable stream. The dam when constructed created Lake Murray.

In 1943 the Commission approved the transfer of the license from the Lexington Water Power Company to South Carolina Electric & Gas Company. The Commission concluded in 1928 that it had jurisdiction over the Saluda River because of future navigable capacity and its effect on interstate commerce as a part of a waterway system. It has continued to exercise jurisdiction over the project for nearly fifty years. The court concludes it has jurisdiction.

There has been some private development in the area. Petitioner Smith's interest arises because he has built a residence on or adjacent to the lake, as has been done by others, the exact number not being shown by the record. The members of the Committee to Save Lake Murray also own real estate in the lake area or utilize the lake's recreational benefits.

In 1972, or prior, condominium development was planned by the Partnership. The Company filed an application, which was later amended, to grant an easement to the Partnership. The original request called for an easement utilizing 2.83 acres of project land and areas in the reservoir for the construction of four causeways, including a bridge section to islands in the lake, and for the laying of a pipe along the lake bottom for discharge of effluent. The easement was to serve a proposed development of 494 units, 114 of which were on the mainland and 380 on five private small islands within the project reservoir. The challenged order of the Commission limits the effluent line easement to the 114 mainland units. The Company also filed two additional applications for authority to grant easements, one for a housing

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

development, Edgewater Shores, and the other to the State Department of Parks, Recreation, and Tourism for development of a park on Dreher Island. These applications are not before the court in this case.

The application of the Company to grant the easement was accompanied by a proposed environmental impact statement. This statement was distributed to eight federal agencies, eleven state agencies and two local governmental subdivisions (J.A. at 30–31), and became available to the public on or about June 2, 1972. The Commission thereafter on June 5, 1972 docketed its "notice of application for change in land rights".

There was only one adverse comment or objection. The South Carolina Wildlife Resources Department objected to the proposed clearance height of the bridge section which was to be built. The proposed clearance was increased and this objection was later withdrawn.

Petitioner Smith on October 13, 1972 filed a complaint with the Commission claiming that sewage seepage from holding tanks and large amounts of chlorine and related chemicals utilized in treatment of sewage would be discharged into Lake Murray adversely affecting the recreational purposes of the lake. He listed by a separate letter filed in December, 1972 nine locations of possible sources of alleged pollution, and included the Partnership's proposed development as a possible future source of pollution. On December 11, 1972, pursuant to its amended regulations, the Commission staff drafted an environmental statement which was filed. Notice of its availability was published in the Federal Register. It was circulated to the relevant agencies. The Region IV Environmental Protection Agency, by letter of February 8, 1973, stated:

" . . . no significant long-term adverse effects on water quality are expected if erosion control measures are practiced during construction and tertiary treatment is applied to all

sanitary wastes entering Lake Murray." (J.A. 112)

Earlier the South Carolina Pollution Control Authority by letter dated June 28, 1972, filed with the Commission on July 3, 1972, had stated that the proposed facility would not violate applicable state water quality standards.

A final environmental impact statement (J.A. 149–231) was prepared by the Commission and circulated on April 18, 1973. Thereafter, a member of the Commission staff, Company employees and petitioner Smith conducted an on-site inspection, and conducted interviews with the South Carolina Board of Health and Pollution Control authorities. In June, 1973 the Region IV Environmental Protection Agency certified that the partnership was in compliance with the Water Pollution Control Act Amendments of 1972 (J.A. 292).

The Commission's order of September 10, 1973 approved the application. The approval granted was for the construction and the operation of the effluent line for the 114 housing units on the mainland. The construction of the bridge referred to above and the development of the islands was not included in the approval and has thus been deferred. Approval was conditioned upon the Partnership's continued compliance with all water quality standards imposed from time to time by state or federal agencies and it was further provided that on or before July 31, 1974 the Partnership was to obtain a Section 402 permit pursuant to Section 402 of the Federal Water Pollution Control Act as amended October 18, 1972. The order also provided that the plans and specifications of the tertiary treatment plant were to be submitted to and approved by the South Carolina Pollution Control Authority. Morever the easement agreement itself requires that certain conditions be complied with by the grantee partnership (J.A. 12–21).

The remainder of the easement application of the Partnership was deferred until a public hearing could be held, at

which time other applications such as the application of Edgewater Shores, the proposed state park application, and the Partnership's development of the islands would be considered.

Petitioner Smith filed an application for rehearing October 4, 1973, pursuant to Section 313 of the Federal Power Act and on October 10 the Committee filed its petition to intervene in the application for rehearing and incorporated by reference the allegations of petitioner Smith.

Intervention was granted regarding matters other than those disposed of by the September order and Smith's motion for rehearing, joined in by the Committee, was denied by the order of November 2, 1973 above mentioned.

The petitions for review above described followed. We affirm.

The issues will be addressed in the order outlined above.

■ We conclude that the Commission acted within its statutory authority in granting the application for the limited easement. Section 4(e) of the Federal Power Act, 16 U.S.C. § 797(e) (1964) authorizes the Commission

"To issue licenses . . . for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient for the development and improvement of navigation and for the development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction . . .."

Section 10(a) of the Act, 16 U.S.C. § 803(a) (1964) requires

"That the project adopted . . . shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, and for other beneficial

public uses, including recreational purposes . . .."

The original license issued August 5, 1927 specifically provided that the licensee would retain possession of the project area, the project works, and all franchises, *easements*, (emphasis supplied) water rights, and rights of occupancy and use and that none of these would be voluntarily sold, transferred, abandoned, or otherwise disposed of without the approval of the Commission (Record at p. 17). In the application procedure the Commission has acted in accord with the statutory authority that requires the Commission's approval for an easement. Petitioner's argument that the Commission has violated § 803(a) by approving an easement for a private development will be addressed *infra*.

■ We conclude that the Commission's order was based upon substantial evidence. The scope of review by this court is limited by § 313(b) of the Act, which provides that "[t]he finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." 16 U.S.C. § 825*l*(b). Substantial evidence has been described as "something less than the weight of the evidence" and it has been said that the "possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). *See, also*, Municipal Distributors Group v. F.P.C., 151 U.S.App.D.C. 415, 467 F.2d 741 (1972).

■ Petitioners assert the Commission did not consider all of the relevant evidence in reaching the conclusion to grant the limited easement and that public hearings should have been held to fully develop all available evidence. The Commission had before it a complete environmental impact statement. The environmental impact statement provided more than enough data to establish a

rational basis for, and is more than "substantial evidence" supporting, the Commission's order. No agency, state or federal, produced evidence that a detrimental ecological effect would result from the granting of the easement if the safeguards, provided for by the Commission's order, were taken. Contrary to petitioners' assertions, the order was neither arbitrary nor capricious and clearly had a rational basis in the evidence.

Petitioner Smith's complaint and follow-up letter were investigated, and an on-site inspection was had. The totality of the record indicates that the order of the Commission is supported by "substantial evidence."

■ Petitioners assert that the approval of the limited effluent line easement shifts the use of the lake from a public to a private use. We conclude that the one effluent line approved is not sufficient to make such a radical change in the description of Lake Murray. Private users of the project are already present, i. e., the petitioners, who own property in the lake area. The notion of a public trust doctrine is not violated by the carefully limited development authorized by the approval of the limited easement. The recreational value of the lake is not endangered by pollution[1] or by overcrowding[2] by the approval of the limited easement.

It is important to note that this case deals with the granting of an easement, not a license. The Act's licensing provisions clearly contemplate that private parties as well as utilities would participate in the development of our nation's water resources.

It is not for this court at this time to mark the extent of private development in the Commission project lakes area. Later if it becomes evident that public access and recreational opportunity has been or will be frustrated to such a degree that a court can conclude that the Commission has failed to perform its statutory duty, the lines can be drawn. We are not confronted with such a situation here.

Here we have a few who are enjoying the privileges of the public development, trying to keep others from having the same privilege for their families. The findings of the environmental impact statement do not justify giving plaintiff and intervenor Committee members such a monopoly. The future uses of the Lake Murray project waters are matters for the Commission's determination in subsequent applications.

The record indicates that the Company's recreational plan approved by the Commission, 36 FPC 136 (1966), includes the leasing of park sites to the State of South Carolina.

Regarding such public development, the Department of Interior, in commenting on the draft environmental impact statement, indicated by letter dated February 1, 1973 (J.A. 107, 200, 2 copies), that the Partnership's "complex will preempt the realization of the full public recreation potential of the project" by the development of the islands. The limited nature of the easement granted by the Commission solved this concern. The Department of Interior is not foreclosed from participating in the later hearings to be held. The Department of Interior also recommended the creation of an outdoor recreational development plan by interested state and federal agencies so that the impact of private developments can be more accurately

1. See EPA and State Pollution Authority letters, *supra*.

2. The final environmental impact statement (J.A. 166), noted that full development of the contemplated 494 units would have approximately 2,500 residents and cause an increase of 140 user days per person per year. It also noted in substance that this figure would constitute 6% of the estimated future public usage of 550,000 user days. The impact statement found that the lake could readily absorb this relatively small increase in recreational use. This finding dispels any claim that the limited easement, approving only one-third of the initially proposed units, would substantially impair the recreational use of the lake.

gauged. The Commission appears to be cognizant of the dangers of piecemeal development.[3] The Commission has ordered a public hearing regarding the other applications for easements so that a consolidated view of development pressures can be obtained. Such a view may cause the Commission to reappraise other aspects, such as the Company's policy (referred to in the Department of Interior's letter. J.A. 108, 201), of disposing of project lands above the 360 contour which have not been specifically identified for recreation. But these matters initially rest with the Commission and are not in question here. We express no opinion as to the final action to be taken.

No state or local agency has opposed private development of the area of the project in question. The limited easement use of the project's waters by a private entity is not a *per se* violation of the Commission's statutory duty.

Petitioners assert a public hearing should have been held prior to the granting of the easement. Notice of the Company's application for the easement was given on June 5, 1972. Procedure was outlined for individuals who wished to intervene. Smith instead filed a complaint on October 9, 1972. The complaint and follow-up letter from Smith's counsel were considered by the Commission. Reference is made to Smith's objections in the Commission's order of September 10, 1973 (J.A. 296). No prejudice has been demonstrated by the lack of such a hearing. Petitioner Smith's objections and comment were heard.

The order also provides for a public hearing (referred to above) on the remaining applications for easements of the Watergate development, for the proposed state park on Dreher Island, and for the other private development. In ordering the hearing the Commission exercised reasonable caution in providing

**3.** September 10, 1973 order of Commission (J.A. 296):

"We are concerned with the practice of allowing increased use of project lands and waters on a piecemeal basis rather than be-

for the future development of the lake in light of the increasing number of requests for easements. There is no evidence to indicate the limited easement granted by the September 10, 1973 order endangers the lake in any manner.

In summary, the record clearly manifests more than the required "substantial evidence" in support of the Commission order. The order of the Commission must be affirmed.

ing related to a comprehensive consideration of the capacity of the project lands and waters to serve known and forseeable [sic] proposed public uses which might be imposed on them."