**TELEPHONE USERS ASSOCIATION,**
Petitioner,

v.

**PUBLIC SERVICE COMMISSION OF the DISTRICT OF COLUMBIA,**
Respondent.

The Chesapeake and Potomac Telephone Company, Intervenor.

**The CHESAPEAKE AND POTOMAC TELEPHONE COMPANY,**
Petitioner,

v.

**PUBLIC SERVICE COMMISSION OF the DISTRICT OF COLUMBIA,**
Respondent.

Nos. 6819, 6846.

District of Columbia Court of Appeals.

Argued Jan. 24, 1973.

Decided April 6, 1973.

Robert A. Levetown, Washington, D. C., with whom Alfred Winchell Whittaker and John P. Barnes, Washington, D. C., were on the brief, for the petitioner and the intervenor, The Chesapeake and Potomac Telephone Co.

Arthur S. Curtis, Washington, D. C., for petitioner Tel. Users Ass'n.

C. Belden White, II, and Linus H. Deeny, Assistant Corp. Counsels, Washington, D. C., with whom C. Francis Murphy, Corp. Counsel, Washington, D. C., was on the brief, for respondent.

Before FICKLING, KERN and YEAGLEY, Associate Judges.

KERN, Associate Judge:

Telephone Users Association, Inc. (TUA) and the Chesapeake and Potomac Telephone Company (C&P) each filed a petition of appeal from an order entered by the Public Service Commission of the District of Columbia (Commission) authorizing C&P to increase the rates it charged for telephone service rendered within the District of Columbia. We consolidated these appeals for argument and decision.

In essence, TUA contends that there were certain deficiencies in the Commission's proceedings serious enough to invalidate its order and that this order was not supported by the evidence. C&P argues in its appeal that the Commission erroneously determined the dollar amounts of C&P's (a) investment and (b) operating expenses with the result that the increase in telephone rates authorized by the Commission is insufficient to afford the company a reasonable opportunity to earn a fair rate of return on its investment.

I.

■ We may entertain TUA's appeal and consider its contentions under the applicable statute [1] only if it is a "person or corporation affected by" the Commission's order in this case. See United States v. Public Utilities Commission, 80 U.S.App. D.C. 227, 151 F.2d 609 (1945). Since the business of courts is to decide concrete controversies rather than render advisory opinions, one who seeks judicial review of agency action must show the impact of such action on himself. See Davis, Standing: Taxpayers and Others, 35 U.Chi.L.

Rev. 601, 617 (1968). ("[T]he federal courts have consistently adhered to one major proposition without exception: One who has no interest of his own at stake always lacks standing.") In the instant case, TUA's petition of appeal to this court neither alleges nor recites facts to show that *it* will be directly affected by the Commission's order. See Interstate Electric v. Federal Power Commission, 164 F. 2d 485, 486 (9th Cir. 1947).

The record of the proceedings before the Commission contains a petition by TUA for leave to intervene alleging that it (1) is a District of Columbia non-profit association, (2) is "itself a telephone user and will be affected by any order as to local rates" and (3) "represents others similarly situated."

The administrative record also contains an answer by C&P to TUA's intervention.

(1) alleging that, according to its records (a) TUA does *not* itself subscribe to telephone service, and (b) TUA's attorney in this proceeding has subscribed for and is billed for that telephone number under which TUA is listed in the telephone directory;

(2) citing a comment by the Federal Communications Commission in a Bell System rate case that "[I]t appears that the association [TUA] is, for all intents and purposes, the alter ego of its attorney," 31 Fed.Reg. 9888 (1966), and,

(3) pointing to a statement by TUA's attorney on the record to the Commission during a prior telephone rate case (Formal Case No. 538, June 7, 1971) that, "We [TUA] don't function on a membership basis." (Tr. at 3725.)

We note that despite the Commission's Rule 5.3(e) requiring that "every petition

---

1. D.C.Code 1972 Supp., § 43–705 provides in pertinent part:

 The District of Columbia Court of Appeals shall have jurisdiction to hear and determine any appeal from an order or decision of the Commission. Any public utility or any other person or corporation *affected by any final order* or decision of the Commission . . . may . . . file with the . . . Court of Appeals a petition of appeal . . . . (Emphasis added.)

. . . *shall* contain . . . . [v]erification and signature of *petitioner* . . . and the signature and address of the attorney," [emphasis added], only TUA's attorney signed TUA's petition to intervene.[2]

We note also that the Commission denied TUA leave to intervene in a 1965 telephone rate case (Formal Case No. 506, Order No. 4938, June 4, 1965) and commented in a 1969 rate case that "there is almost no information in the record" about TUA. (Formal Case No. 538, Order No. 5460, Mar. 19, 1971.) We find ourselves in much the same predicament because (1) TUA presented no testimony or exhibits in this case and (2) the Commission's order (Formal Case No. 570, Order No. 5483, Nov. 27, 1971, p. 3) granting TUA leave to intervene contains no explanation for its decision except to refer to TUA as "a telephone user."

■■ We have no doubt that one who alleges that he uses *and pays for* telephone service would be affected by any order increasing telephone rates. *See* Telephone Users Association v. FCC, 126 U.S.App. D.C. 178, 375 F.2d 923 (1967). However, this record does *not* contain any allegation or evidence that TUA, as contrasted with its attorney, is itself *paying* for the telephone it uses or otherwise has a "direct stake in the outcome" of this proceeding. Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).[3] *See* Winston v. Zoning Board of Appeals, 407 Ill. 588, 95 N.E.2d 864, 868–869 (1950). We

conclude that TUA has failed to show it will be "affected by" the Commission's order to a legally cognizable extent. Accordingly, we are precluded from reviewing TUA's appeal and its petition must be dismissed.

## II.

In considering C&P's appeal we are obliged to keep in mind that Congress has vested rate-making authority in the Commission and that the scope of our review of its final rate orders is limited.[4] The United States Court of Appeals for this Circuit, formerly vested with jurisdiction over Public Service Commission orders, described what it deemed to be the proper scope of judicial review:

Our role as a reviewing court is not to make an independent determination as to whether fares fixed by the Commission are just and reasonable, but rather to insure that the Commission, in exercising its rate-making power, has acted rationally and lawfully. Our function is normally exhausted when we have determined that the Commission has respected procedural requirements, has made findings based on substantial evidence, and has applied the correct legal standards to its substantive deliberations. . . . [Williams v. Washington Metropolitan Area Transit Commission, 134 U.S.App.D.C. 342, 362, 415 F.2d 922, 942–943 (1968), cert. denied, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969).] (Footnote omitted.)

2. The FCC in its Memorandum Opinion and Order in Docket No. 16258 denying TUA intervention commented:
 "*Nothing* . . . *is contained* . . . [in TUA's petition to intervene] *with respect to* the nature of the association, the number or character of its membership or *its officers. Neither* of the pleadings *gives any address for the association other than that of counsel who signed the pleadings.* [31 Fed.Reg. 9888 (1968).]

3. The Supreme Court there said (at 740, 92 S.Ct. at 1369):
 The requirement that a party seeking review *must allege* facts showing that he

is himself adversely affected . . . . does serve as at least a rough attempt to put the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome . . . . (Emphasis added.)

4. D.C.Code 1967, § 43–706 provides in pertinent part:
 [T]he review by the court shall be limited to questions of law . . . and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings . . . are unreasonable, arbitrary, or capricious.

The Supreme Court has recently summarized the responsibilities of a reviewing court:

*First*, it must determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. *Second*, the court must examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. *Third*, the court must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. . . . (Emphasis added.) [Permian Basin Area Rate Cases, 390 U.S. 747, 791–792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968), aff'd in part and rev'd in part sub nom. Skelly Oil Co. v. Federal Power Commission, 375 F.2d 6 (10th Cir. 1967).

Basically, C&P claims that the Commission's order is confiscatory because the rates it is now authorized to charge for services rendered are still insufficient to afford it even a reasonable opportunity to earn the return on its investment which the Commission approved. *See* Re PEPCO, 83 P.U.R.3d 113, 127 (D.C. PSC 1970).[5] We now describe briefly the Commission's

rate-making calculation in this case so as to place C&P's argument in perspective.

■ Rate-making for a particular utility is in essence making a forecast of its future financial status upon the basis of its known performance during a span of time in the immediate past, *viz.*, a "test period". Re C&P Co., 57 P.U.R.3d 1, 26 (1964). Michigan Wisconsin Pipe Line Co. v. Federal Power Commission, 263 F.2d 553, 555–556 (6th Cir. 1959). Using 1971 as the test year, the Commission first determined C&P's weighted average rate base[6] to be about 224 million dollars and a fair and reasonable rate of return on such investment to be 8½%.[7] It then multiplied the rate base of 224 million dollars by the 8½% rate of return to obtain C&P's revenue requirement,[8] which amounts to about 19 million dollars. Since the revenue requirement is the result of the rate base times the rate of return, its determination will be dependent upon the value of each of these two components.

The Commission also determined C&P's *net* revenue for the 1971 test year to be about 13 million dollars. The Commission then found that C&P's actual net revenue fell 6 million dolars short of the 19 million dollar revenue requirement it had previously determined to be a fair and reasonable return on C&P's investment. Therefore, the Commission authorized C&P to make up this difference, adjusted for certain tax factors, by increasing the rates it charged its customers. (Formal Case No.

5. C&P argued that it needed a rate increase sufficient to produce an *additional* 22½ million dollars of revenue, but the Commission concluded that a rate increase yielding only some 13 million dollars *additional* revenue was justified. (Formal Case No. 570, Order No. 5518, July 6, 1972, at 2, 23.)

6. Rate base is defined as the value of a company's property used and useful in the public service minus accrued depreciation. C. Phillips, Economics of Regulation 216 (1969). This Commission uses original

cost accounting. Re PEPCO, 64 P.U.R. 3d 364, 374 (D.C. PSC 1966).

7. *See* Williams v. WMATC, *supra*, 134 U.S.App.D.C. at 348, 415 F.2d at 928 for a discussion of rate of return.

8. Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944). This is the amount the Commission determines to be the total revenue required by C&P "to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital."

570, Order No. 5518, July 6, 1972, at 20–23.)

■ It may be seen that the Commission's determination as to the rates C&P may charge its customers to meet its revenue requirement is directly affected by the Commission's findings of the amount of (1) C&P's rate base and (2) C&P's *net* revenues, the latter derived by subtracting appropriate expenses from total revenues. Our Circuit Court said in Mississippi River Fuel Corp. v. Federal Power Commission, 82 U.S.App.D.C. 208, 226, 163 F.2d 433, 451 (1947), "[A] court can review the fairness, reasonableness, and non-confiscatory character of a rate only by reviewing the propriety of the *elements* of which the rate was composed." (Emphasis added.) Since the findings of the Commission with respect to rate base and net revenues directly influence the ultimate determination of the rates C&P may charge, these subsidiary findings are subject to our review. II F. Cooper, State Administrative Law 735, 738 (1965).

■ In rate-making, ordinarily, the utility's average rate base for the test period is used, but an exception to this general rule of utility regulation is recognized by the Commission [9] and other public service agencies [10] when a condition known as "attrition" is found to exist. Attrition "describe[s] the tendency of the rate of return to diminish in a period of comparatively high construction costs. . . . As the high cost plant comes into service, it tends to increase the applicable rate base [investment] at a *more rapid pace* than the re-

sultant earnings [net operating revenues], and the rate of return decreases accordingly." (Emphasis added.) New England Telephone & Telegraph Co. v. Department of Public Utilities, 331 Mass. 604, 121 N. E.2d 896, 906 (1954).[11] When "attrition" occurs then the ratemaker may use a company's *year-end* rate base instead of weighted *average* rate base to compensate for the attrition. City of Lynchburg v. Chesapeake and Potomac Telephone Co. of Virginia, 200 Va. 706, 711, 107 S.E.2d 462, 469 (1959). C&P's 1971 *weighted average* rate base was *less* than its end-of-year base (Dec. 31, 1971). Claiming that attrition existed, C&P sought to have its year-end rather than its weighted average rate base used in determining its revenue requirement. As shown above, given a certain rate of return, the larger the rate base of the utility the greater will be its revenue requirement.[12]

C&P submitted the following data during the Commission proceeding to prove attrition.

The rate of return it *actually* realized on its investment had on the whole *decreased*:

|  | Intrastate Rate of Return on Net Investment |
|---|---|
| 1966 | 6.96% |
| 1967 | 6.85% |
| 1968 | 6.33% |
| 1969 | 7.06% |
| 1970 | 6.62% |
| 1971 | 6.79% |
| 1972 (forecast) | 5.03% |

9. Re C&P, 57 P.U.R.3d 1, 26 (D.C. PSC 1964) ; Re PEPCO, 28 P.U.R.3d 206, 217–218 (D.C. PSC 1959) ; Re PEPCO, 8 P.U.R.3d 76, 89–90 (D.C. PSC 1955).

10. *E. g.*, Re Southern Bell Tel. & Tel. Co., 93 P.U.R.3d 76, 86 (S.C. PSC 1971).

11. For additional definitions of attrition, *see* City of Lynchburg v. Chesapeake & Potomac Telephone Co. of Virginia, 200 Va. 706, 107 S.E.2d 462 (1959) ; Re PEPCO, 64 P.U.R.3d 364, 381 (D.C. PSC 1966) ; Phillips, Economics of Reg-

ulation, *supra* at 243–244 cites this hypothetical: "Suppose a commission sets a company's rate base at $10 million and allows a 6 percent rate of return, resulting in annual earnings of $600,000. If, however, the company completes construction of a $1 million new plant and puts it into operation during the new year, and if total earnings increase to $627,000, the rate of return will be 5.70 percent."

12. Revenue requirement equals rate of return times rate base.

The ratio of its operating expenses to total revenues had generally *increased*:

### Intrastate Operating Ratio

| | |
|---|---|
| 1966 | 68.39% |
| 1967 | 68.70% |
| 1968 | 69.05% |
| 1969 | 68.52% |
| 1970 | 71.48% |
| 1971 | 70.63% |
| 1972 (forecast) | 77.69% |

and,

The revenue generated by its operation compared to its investment had *declined*:

### Intrastate Operating Revenue Per $100 of Intrastate Net Investment

| | |
|---|---|
| 1966 | $47.21 |
| 1967 | $45.33 |
| 1968 | $44.94 |
| 1969 | $46.00 |
| 1970 | $43.96 |
| 1971 | $44.57 |
| 1972 (forecast) | $41.70 |

The Commission, without *specifically* stating whether or not attrition existed, refused to use end-of-year rate base instead of weighted average rate base. It explained in its order denying C&P's application for reconsideration (at 6–7):

[O]ur holding was only that these two, or even all three of these tests, taken by themselves and in the absence of other and supporting considerations, are not necessarily conclusive as to the existence of attrition. . . .

. . . . . . . . .

. . . [W]e . . . found that these data, *properly viewed*, did not provide the requisite specific evidence to demonstrate the need for the attrition adjustment. . . . (Emphasis added.)

■ It is necessary to turn back to the Commission's original order [13] in this rate case to learn how this data is "properly viewed" by the Commission. The Commission stated therein (at 8):

[T]he data for the 1966–1969 period . . . are irrelevant . . . since whatever attrition occurred during that period was recognized and allowed for in our decision in the Company's last rate case. . . .

However, we note that the order in the Company's last rate case [14] reveals that the Commission did *not* expressly recognize that attrition existed in C&P's operations. Rather, the Commission in that rate case apparently granted C&P relief because of the long lapse of time between the initiation of and the final decision in C&P's rate case.[15] In addition, we are of opinion that the Commission erred in the present case in refusing to consider C&P's evidence for the years 1966 through 1969 since

---

13. The Commission's order is reported in 95 P.U.R.3d 339 (D.C. PSC 1972). Its order denying applications for reconsideration is reported in 96 P.U.R.3d 373 (D.C. PSC 1972).

14. Formal Case No. 538 (Order No. 5465, June 7, 1971).

15. The Commission said:
   If our determination between year-end and average rate base were to depend on these factors alone [the three indicia of attrition], we would be presented with a difficult decision.
   However, there is an additional factor which we feel must be recognized in this proceeding, *i. e.,* the factor of regulatory lag . . . . By the time these proceedings are completed and an order is issued, the better part of two years will have elapsed since the end of the test period. During those two years, the inflationary trend has continued unabated. Realistic rate-making should take into account this time lag. Its existence, coupled with the evidence of attrition discussed above, amply justifies the use of year-end rate base in determining future revenue requirements. [Formal Case No. 538, Order No. 5460, Mar. 29, 1971, at 36.] [Excerpt from the Proposed Findings, Opinion and Order, incorporated into the final order with certain changes not here pertinent.]

attrition is a condition which can only be exemplified by showing a *trend* over a series of years, and this is what C&P was seeking to show by this data.

■■ The Commission with respect to the data submitted by C&P for 1972 in support of its claim of attrition states in its order (p. 8):

> Also included in the seven-year data submitted by the Company are figures reflecting a Company forecast with respect to 1972 operations. However, we are unable to give these figures the weight urged by the Company with regard to the attrition problem *in light of the purpose for which they were prepared and the doubts and questions raised with respect to them on cross-examination.* (Emphasis added.)

The Commission in its order denying rehearing explained further its rejection of the 1972 figures (p. 8):

> Our rejection of the 1972 forecast here was based on the doubts and questions raised on the record with respect thereto . . . . The acceptability of forecasts continues, as in the past, to depend on the *pertinent circumstances as disclosed by the record.* (Emphasis added.)

We are unable to determine from these orders what in fact were the "doubts and questions raised" about C&P's 1972 forecast and what were the "pertinent circumstances" which caused the Commission to reject C&P's 1972 figures. It is the responsibility of the Commission to present its decisions in a manner amenable to judicial review and in view of the present state of the record we can only speculate as to the evidence upon which the Commission was relying.[16] We note, however, evidence in the record that (1) C&P's forecasts in the past had proved accurate,[17] (2) Commission auditors are permanently assigned to C&P's premises and continuously audit C&P's books which are maintained in accordance with a Commission-prescribed accounting system,[18] and (3) C&P's expert testified that the 1972 "forecast was developed in the ordinary course of business as part of our normal budgetary process."[19] Given these circumstances we are of opinion that the Commission has erred in refusing to consider C&P's 1972 forecast.[20]

The Commission, having refused to give any consideration to C&P's data for 1966 to 1969 and for the year 1972, stated (at 9):

> This leaves us the data for the three-year period 1969–71, which the Company

---

16. Permian Basin Area Rate Cases, *supra*, 390 U.S. at 792, 88 S.Ct. 1344, 20 L.Ed. 2d 312; Colorado Wyoming Gas Co. v. Federal Power Comm'n, 324 U.S. 626, 634–635, 65 S.Ct. 850, 89 L.Ed. 1235 (1945); SEC v. Chenery Corp., 318 U.S. 80, 94–95, 63 S.Ct. 454, 87 L.Ed. 626 (1943); Citizens Assoc. of Georgetown, Inc. v. Zoning Comm'n of District of Columbia, 477 F.2d 402, at 407–408 (D.C. Cir., 1973); Brooks v. Atomic Energy Comm'n, 476 F.2d 924, at 927 (D.C. Cir., 1973); Municipal Distribs. Group v. Federal Power Comm'n, 467 F.2d 741, 748 (D.C.Cir. 1972); Sun Oil Co. v. Federal Power Comm'n, 144 U.S. App.D.C. 288, 295, 445 F.2d 764, 768 (1971); WAIT Radio v. FCC, 135 U.S. App.D.C. 317, 320, 418 F.2d 1153, 1156 (1969); D.C. Transit System, Inc. v. WMATC, 121 U.S.App.D.C. 375, 401, 350 F.2d 753, 779 (1965).

17. Tr. at 627 (cross-examination of Mr. Kagen, Chief Accountant of the Commission); C&P Exhibit No. 3C at 6 (Rebuttal.)

18. Staff Exhibit 8 at 2 (Testimony of Mr. Kagen).

19. C&P Exhibit No. 3C at 3.

20. Some courts have suggested, without expressly holding, that a commission should consider post-test-period data. *See* West Ohio Gas Co. v. Pub. Util. Comm'n [No. 2], 294 U.S. 79, 55 S.Ct. 324, 79 L.Ed. 773 (1935); Lindheimer v. Ill. Bell Tel. Co., 292 U.S. 151, 54 S.Ct. 658, 78 L.Ed. 1182 (1934); New York Tel. Co. v. Pub. Serv. Comm'n, 29 N.Y.2d 164, 324 N.Y.S.2d 53, 272 N.E.2d 554 (Ct.App.1971); Boston Gas Co. v. Dept. of Pub. Util., 269 N.E.2d 248 (Mass. 1971); New England Tel. & Tel. Co. v. Dept. of Pub. Util., *supra.*

submitted as part of its direct case and which the Company also claims demonstrates the presence of attrition. . . . [*T*]*here is a reversal in 1970–1971 of the "trend"* allegedly reflected in the 1969–1970 data under each of the three tests. (Emphasis added.)

However, the Commission itself had recognized in C&P's last rate case that C&P's financial position in 1971 was significantly improved not because its investment was able to generate more revenues than in prior years but solely as the result of action taken by the Federal Communications Commission in changing over costs from intrastate to interstate telephone operations.[21] Thus, the Commission had recognized in Formal Case No. 538, Order No. 5460 (March 29, 1971), pp. 58–59:[22]

> [S]ignificant changes . . . occurred while these proceedings were in progress. First, and by far most important, the Ozark Plan of separations . . . provided very substantial benefits to the District of Columbia ratepayers . . . it . . . shifted more than $5,000,000 from the intrastate to the interstate side of the Company's revenue requirements. *Percentage wise, this was by far the greatest benefit which any jurisdiction in the county received from the Ozark Plan.* . . . (Emphasis added.)

■ We hold that the Commission's conclusions (1) *not* to consider C&P's data for the years 1966 to 1969 and for the year 1972 and (2) that the data for 1970 and 1971, *considered alone,* failed to show at-

trition, were arbitrary and without support in reason or the evidence. We are *not* today holding that C&P's evidence in the record requires a finding by the Commission of attrition, or that if the Commission finds attrition it would be *compelled* to use C&P's year-end rather than its weighted average rate base.[23] We do hold that the Commission has failed to make adequate findings based on evidence in the record respecting C&P's claim of attrition and for that reason this case must be remanded for further findings.[24] Judge Prettyman's comment, speaking for the District of Columbia Circuit Court in Mississippi River Fuel Corp., *supra* at 82 U.S.App.D.C. 227, 163 F.2d at 452, seems particularly apt:

> [T]he Commission, even though expert, is forbidden to be arbitrary. And the courts are directed to prevent it from being so. The Commission cannot . . . shield arbitrariness . . . by failure to state adequate reasons for its conclusions. This court, in the present case, has not reversed the conclusions of the Commission, except in the procedural sense necessary to a remand. It has remanded the case for clarification where clarity is not present, and for completion where incompleteness now exists. When the findings and conclusions are complete and clear, the court will then, if appropriate proceedings are brought, consider whether the ultimate rulings of the Commission are within the permissible bounds of its power. . . .

We turn now to the Commission's determination of the amount of C&P's expenses

---

21. Prescription of Procedures for Separating and Allocating Plant Investment, Operating Expenses, Taxes and Reserves Between the Intrastate & Interstate Operations of Telephone Companies, 26 F.C.C.2d 247 (1970).

22. Order No. 5460 was actually the proposed, rather than the final Findings, Opinion and Order. However, the final version, issued June 7, 1971, did not differ from the proposed in any respects herein pertinent.

23. New England Tel. & Tel. Co. v. Mass. Dept. of Pub. Util., 275 N.E.2d 493, 500–501, 92 P.U.R.3d 113, 119 (Mass.1971). Phillips, Economics of Regulation, *supra* at 243–244, 296. *But see* note 9 *supra* and cases cited therein.

24. D.C.Code 1972 Supp., § 1–1509(e) provides *inter alia* that "findings of fact shall consist of a concise statement of the conclusions upon each contested issue . . . supported by and in accordance with the reliable, probative and substantial evidence. . . ."

which undergirds its findings of C&P's net revenues. The Commission summed up the issue in its order (pp. 17–19):

> As part of its direct case, the Company sought the allowance of a net amount of $1,120,000 to give full annual effect to the certain wage adjustments which became effective at various times in 1971, *pursuant to the terms of the three-year settlement which it had recently negotiated with the Union.* On rebuttal, the Company sought, in addition, two further increases in employee expenses, one in the net amount of $105,000 to reflect a Group Hospitalization rate increase, effective *January 1, 1972,* and the other, in the net amount of $638,000 to reflect wage schedule and cost of living adjustments, which, *under the recent wage settlement,* are to be effective on July 1, 1972. . . .
>
>    \*     \*     \*     \*     \*     \*
>
> We are inclined to disallow the two 1972 adjustments proposed by the Company. These adjustments were first proposed as part of the Company's rebuttal case despite the fact that the Company was fully aware of these pending changes at the time it testified in its direct case, thereby *not affording the Staff or Intervenors the opportunity to present evidence of offsetting adjustments to expense or revenues without unduly prolonging the proceeding.* . . . (Emphasis added.)

The Commission's order denying C&P's application for rehearing states (pp. 8–9):

> Both the claim for the 1972 wage adjustments and the Company's 1972 forecast were first made a part of the record as part of the Company's rebuttal case. As a result, the Staff *was unable either to review fully the Company's forecast or present its own evidence of offsetting adjustments without unduly prolonging the proceedings.* . . . (Emphasis added.)

We are unpersuaded by the Commission's assertion of C&P's lack of diligence as justification for not considering these two items of 1972 "employee" expense in determining C&P's net revenues for rate-making purposes. The fact that there would be a wage increase in July 1972 was known to all parties before the hearing even began since this wage increase was the result of a three-year contract between C&P and the union. Only the amount of the wage increase was unknown. Moreover, C&P's counsel at the Commission's pre-hearing conference in October 1971, alerted all parties that C&P might seek allowance for these 1972 expenses when he stated (Tr. at 16):

> [A]lthough we have made no adjustments for 1972, as the Commission's last order [Formal Case No. 538, Order No. 5460, Mar. 29, 1971 at 113] did permit out-of-hearing adjustments . . . we are not waiving our '72 adjustments. We're simply deferring action on them.

We note also (Tr. at 615) that the Staff received in early February (two weeks before filing its own evidence)[25] C&P's forecast of its 1972 operations, containing that information about C&P's expenses and revenues which the Commission stated in its orders the Staff needed in order to be able to respond properly to C&P.

■ Finally, on March 3rd, C&P submitted to the Staff, as a part of its rebuttal testimony (Formal Case No. 570, Order No. 5483, Nov. 22, 1971, at 5), the exact adjustments it proposed and cross-examination of C&P's rebuttal witness was not had until March 14th. Since there was no recordation of the testimony taken on *that particular* day because of transcribing difficulties, the hearing for the purpose of cross-examining C&P's rebuttal witness (and an intervenor's witness) had to be held again on April 4th. (Letters of the Commission, dated March 20 and 22, 1972, Formal Case No. 570). Given these particular facts, we conclude the Commission erred in refusing to consider C&P's data in support of its

---

25. Formal Case No. 750, Order No. 5498, Feb. 7, 1972.

claim for allowance of these additional expenses.

In sum, we are constrained to remand the record to the Commission with directions to consider and weigh *all* the evidence concerning attrition [26] and to make an express determination whether or not attrition exists. If the Commission finds that C&P has made a showing of attrition it must then determine whether the use of C&P's year-end rate base rather than its weighted average rate base would be appropriate. *See* note 23, *supra*.

Further, the Commission must consider C&P's contention that the January 1972 increase in its employees' Group Hospitalization premiums and the July 1972 increase in its employees' wages are adjustments that should be made in the 1971 test year data.[27]

We expect that the Commission's determinations will be explicit and supported by clear and comprehensive findings so that our further review can be facilitated. Washington Gas Light Co. v. Baker, 88 U.S. App.D.C. 115, 127, 188 F.2d 11, 23 (1950). *See* cases cited in note 16 *supra*.

In remanding the record we leave it to the Commission's informed judgment whether further hearings are appropriate. The Commission's order under review in this case granting rate increases to C&P shall remain in effect pending the further proceedings on remand.

The petition of appeal in No. 6819 is dismissed; the record on appeal in No. 6846 is remanded for further proceedings.

26. The Staff introduced evidence consisting of a table purporting to show that C&P's net revenues were in fact keeping pace with its investment over the years in question. [Staff Exhibit No. 8A, Schedule 16.] C&P challenged the Staff's formula as not being a valid indicator of whether or not attrition existed because it erroneously compared each subsequent year of the Company's performance to *one base* year.

27. We note that the Commission in C&P's last rate case (Formal Case No. 538) adjusted the Company's test period expenses to reflect known future wage increases and did *not* deem it necessary to make offsetting adjustments to revenues. Order No. 5460, Mar. 29, 1971, at 13-14.