476 A.2d 1113 (1984)
D.C. TELEPHONE ANSWERING SERVICE COMMITTEE, Petitioner,
v.
PUBLIC SERVICE COMMISSION OF the DISTRICT OF COLUMBIA, Respondent,
The Chesapeake and Potomac Telephone Company, Office of People's Counsel, MCI Telecommunications Corporation, Inc., American Broadcasting Companies, Inc., Intervenors.
UNITED STATES, Petitioner,
v.
PUBLIC SERVICE COMMISSION OF the DISTRICT OF COLUMBIA, Respondent,
The Chesapeake and Potomac Telephone Company, Office of People's Counsel, MCI Telecommunications Corporation, Inc., American Broadcasting Companies, Inc., Intervenors.
Nos. 82-1452, 82-1455.
District of Columbia Court of Appeals.
Argued April 7, 1983.
Decided April 24, 1984.
*1117 David E. Worsley, Champaign, Ill., with whom Richard V. McNamara, Washington, D.C., Dennis K. Muncy, Dennis L. Myers, Champaign, Ill. and Peggy C. Thompson, Chicago, Ill., were on the briefs, for petitioner in No. 82-1452.
Brian G. Kennedy, Atty., U.S. Dept. of Justice, Washington, D.C., with whom Stuart E. Schiffer, Deputy Asst. Atty. Gen., Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the briefs were filed, Lawrence Moloney, Atty., U.S. Dept. of Justice, and Patsy L. Mullenix, Gen. Services Admin., Washington, D.C., were on the briefs, for petitioner in No. 82-1455.
*1118 Lloyd N. Moore, Washington, D.C., with whom Roberta Willis, Michael D. Newsom and Michael E. Geltner, Washington, D.C., were on the briefs, for respondent in Nos. 82-1452 & 84-1455.
D. Michael Stroud, Washington, D.C., with whom Lee A. Satterfield, Mark J. Mathis and Robert A. Levetown, Washington, D.C., were on the brief, for intervenor The Chesapeake and Potomac Telephone Co.
Brian J.H. Lederer and Elizabeth A. Noel, Washington, D.C., entered appearances on behalf of intervenor Office of People's Counsel.
Ruth S. Baker-Battist, Washington, D.C., entered an appearance on behalf of intervenor MCI Telecommunications Corp., Inc.
William K. Keane, Washington, D.C., entered an appearance on behalf of intervenor American Broadcasting Companies, Inc.
Before KERN and BELSON, Associate Judges, and REILLY, Chief Judge, Retired.
BELSON, Associate Judge:
These consolidated appeals by D.C. Telephone Answering Service Committee (hereinafter TAS) and the United States General Services Administration (hereinafter GSA)[1] contest different aspects of Public Service Commission (hereinafter PSC or Commission) Final Order No. 7616, which terminated the rate design phase of Formal Case No. 777, a general rate case of the Chesapeake and Potomac Telephone Company (hereinafter C & P).[2] TAS challenges several aspects of the order that affect the cost of operating telephone answering services. GSA challenges various aspects of the order that increase the cost of services which it purchases from C & P. For the reasons stated below, we conclude that PSC has met its burden of supporting its conclusions with substantial evidence, and therefore affirm PSC's challenged decisions, with the sole exception of the matter of the Commission's employment of so-called "residual ratemaking" which we remand for clarification.

I. SCOPE OF REVIEW
Because Congress has delegated rate-making authority to the Commission, not to this court, in analyzing petitioners' contentions we must accord great deference to the expertise and decisions of the Commission. See, e.g., Washington Gas Light Co. v. Public Service Commission, 450 A.2d 1187, 1193 (D.C.1982) (per curiam). As we have often noted, our review of a utility commission order is the narrowest judicial review in the field of administrative law. See, e.g., id. Under D.C. Code § 43-906 (1981) our review is limited to "questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings . . . are unreasonable, arbitrary, or capricious."
In examining Order No. 7616, we must determine whether the order's overall impact is just and reasonable, see People's Counsel v. Public Service Commission, 399 A.2d 43, 46 (D.C.1979), and ensure that PSC "`has respected procedural requirements, has made findings based on substantial evidence, and has applied the correct legal standards to its substantive deliberations.'" Potomac Electric Power Co. v. Public Service Commission, 402 A.2d 14, 18 (D.C.) (en banc), cert. denied, 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182, (1979) (quoting Telephone Users Assoc. v. *1119 Public Service Commission, 304 A.2d 293, 296 (D.C.1973), cert. denied, 415 U.S. 933, 94 S.Ct. 1448, 39 L.Ed.2d 492, (1974)). Because rate-making orders are presumptively valid, the challenged order will be disturbed only if petitioners can demonstrate the existence of a fatal flaw in the Commission's actions. E.g., Washington Gas Light Co., supra, 450 A.2d at 1194. At the same time, the Commission must furnish a rational and precise explanation of the methodology it used as applied to the facts of the case. Washington Public Interest Org. v. Public Service Commission, 393 A.2d 71, 76-77 (D.C.1978), cert. denied, 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979). As we discuss below in Parts II and III, we conclude that petitioners have failed to carry this heavy burden; GSA has, however, raised an unanswered question concerning the Commission's use of "residual rate-making," thus requiring remand for clarification.

II. PETITION OF TAS

A. Standing
Before reaching the merits of TAS' petition it is necessary for us to address the threshold issue of whether TAS has standing to maintain this appeal. Relying upon Telephone Users Association v. Public Service Commission, 304 A.2d 293 (D.C. 1973), cert. denied, 415 U.S. 933, 94 S.Ct. 1448, 39 L.Ed.2d 492 (1974), the Commission maintains that although TAS was allowed to intervene in the proceedings below, the association lacks standing to bring this appeal. In Telephone Users Association we concluded that an association of telephone users which had been permitted to intervene in a rate-making proceeding was barred from obtaining judicial review of the resulting rate order because the association had failed to show that it would be affected by the order to a legally cognizable extent. See id. at 296. Despite certain factual resemblances that Telephone Users Association bears to the instant case, we find the earlier case distinguishable for two reasons.
First, in Telephone Users Association the record revealed almost nothing about the association's membership. It therefore was unclear whether any of the members were C & P customers who would have been affected by the challenged rate order. In addition, the record indicated that the association itself was not a C & P customer, and there was evidence that the association was merely an alter ego of its attorney (who was a C & P customer). See id. and n.2. Thus, the basis upon which the association had been allowed to intervene as a "telephone user" was questionable. Second, the association in Telephone Users Association had presented no testimony or exhibits during the rate hearings. Id. at 296.
Here, by contrast, TAS, in connection with its petition for leave to intervene, supplied a list of the answering services that composed its membership. The members are telephone answering services that do business in the District of Columbia and are rate-paying customers of C & P. In addition, TAS participated actively in the rate-making proceeding. In light of these facts we are of the view that TAS is an organization whose members are affected by Final Order No. 7616, and therefore the organization may represent those members in a proceeding for judicial review of that order. See Sierra Club v. Morton, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972); Dupont Circle Citizens Association v. Barry, 455 A.2d 417, 421 (D.C.1983); Citizens Association of Georgetown v. Simonson, 131 U.S.App. D.C. 152, 153, 403 F.2d 175, 176 (1968), cert. denied, 394 U.S. 975, 89 S.Ct. 1454, 22 L.Ed.2d 775 (1969).

B. Recurring Monthly Rate for the 557A Switchboard
The 557A Switchboard is vintage telephone answering equipment that is used by some telephone answering service bureaus, including members of TAS. Such switchboards *1120 are obsolete and C & P's supplier, Western Electric, has decided to cease manufacturing them. Although C & P's new telephone answering service equipment, AUTOTAS, can be expected to replace some of the vintage equipment, AUTOTAS apparently will not provide an adequate substitute for some answering services that currently use the 557A Switchboard. Therefore, although the 557A equipment is no longer available to new customers, existing customers may obtain additional units from C & P's inventory.
TAS raises several objections to PSC's approval of a 62% increase in the recurring rate for 557A equipment, and seeks reinstatement of the former rate. First, TAS maintains that PSC erred in approving the new rate because the agency failed to recognize errors in C & P's cost methodology. TAS argues that the avoidable cost used to set the 557A rate was overstated because the avoidable cost figure was based upon gross investment (i.e., original cost) rather than net investment (i.e., original cost minus depreciation). TAS argues that because PSC failed to detect this error in C & P's cost studies the approved rate increase was not based upon "reliable" or "substantial" evidence.
C & P and PSC respond that avoidable costs do not include any investment costs. Avoidable costs are those costs that C & P would avoid if a 557A were removed from service (e.g., expenses and taxes necessary to keep the equipment in service). Investment costs, which have already been incurred, are not among those that can be avoided when equipment is withdrawn from service.
After reviewing the record and PSC's findings, we are satisfied that the Commission, upon due consideration, gave adequate explanation for its conclusion that depreciation was irrelevant to the calculation of avoidable costs. Thus, although TAS points to some testimony that supports the opposite conclusion, we cannot say that PSC's determination in this area is unsupported by substantial evidence.
Second, TAS contends that the 62% increase was not fair, just, and reasonable within the meaning of D.C. Code §§ 43-501, -601(d). Specifically, TAS argues that before the rate increase challenged here, the 557A switchboard produced contributions over cost of between 113.2% and 142.3%. Under the new rate TAS maintains that the contribution over cost has increased to between 183.7% and 230.9%. TAS also maintains that this increase was particularly unwarranted in light of the fact that C & P recovers 40% of its costs through the separations process, a fact not reflected in C & P's cost studies.
C & P responds that TAS' calculations regarding the costs of providing a 557A switchboard are flawed because they fail to include all of the items that are provided in connection with the switchboard. When such items are included, C & P maintains, the new rate does not, in fact, exceed costs. PSC maintains that even if the new rate does exceed costs, the agency may properly consider non-cost factors in setting rates and that utility rates need not equal the costs incurred in providing services. PSC argues that in this case it approved the full requested increase in order to protect other services.
We are satisfied that the Commission adequately considered whether the new rate would generate such significant contributions over cost as to be unfair. The Commission explicitly stated that the increase was in conformity with that imposed on other users of terminal equipment. Thus, giving due deference to PSC's expertise, we affirm that body's decision to approve the 62% increase in the recurring rate for 557A switchboards.
Third, TAS maintains that the increase is inconsistent with the position that PSC took in the last C & P rate case, Formal Case No. 729. In that case PSC found that C & P had not sustained its evidentiary burden of justifying the requested rate increase for telephone answering equipment, and therefore approved a *1121 lower increase equal to the overall percentage revenue increase that had been found reasonable. See Re Chesapeake & Potomac Telephone Co., 43 Pub.Util.Rep. 4th 169, 237 (D.C.1981). TAS notes that in the instant proceeding one of C & P's witnesses testified that there had been no change in the circumstances surrounding the provision of equipment and facilities to answering service bureaus since 1981. In light of the absence of any change in circumstances, TAS maintains that PSC should have followed its own precedent and, as in the 1981 rate case, limited any increase in the 557A recurring rate to the overall percentage revenue increase that had been established in the revenue requirements phase of this proceeding. PSC responds that each case must be evaluated in light of its particular facts and record, and that a determination that C & P had not sustained its evidentiary burden in the 1981 proceeding does not constitute precedent in the instant proceeding.
We find unpersuasive TAS' contention that the Commission failed to follow "precedent" established in Formal Case No. 729. A finding that C & P had failed to meet its evidentiary burden in an earlier proceeding clearly does not govern the determination of the appropriate rate in the instant proceeding, which involves different issues and a different record.

C. Concentrator-Identifier Equipment
Concentrators and identifiers are equipment used in connection with telephone answering service switchboards. C & P did not seek to increase the $89.60 monthly rate charged to telephone answering services for such equipment, but requested an increase in the monthly charge for answering service patrons who were served by a concentrator. TAS disagreed with the methodology used in C & P's cost study and requested a decrease in both rates. PSC Staff supported C & P's position, and the Commission concluded that C & P and PSC staff were correct. Therefore, in order to ensure that rates for other services would not have to be raised, the Commission concluded that the decreases requested by TAS should not be approved. See Final Order No. 7616 at 45. In addition, the Commission approved the proposed increase in rates for patrons served by a concentrator. Id.
TAS contends that its request for a reduction in the concentrator-identifier rate was a contested issue of fact and that the Commission failed to make necessary findings, supported by substantial evidence, on this issue. In addition, TAS maintains that the $89.60 recurring rate was not fair, just, or reasonable because C & P's cost studies erroneously calculated total investment on the basis of original installed cost rather than actual net book value. Since C & P's study overlooked depreciation, TAS argues, the concentrator-identifier equipment is producing substantial contributions over cost.
Because TAS did not raise the asserted lack of substantial evidence in its petition for reconsideration, it is unnecessary for us to address the argument here. See D.C. Code § 43-904(b) (1981). With respect to the latter argument  the fairness of the rate  the issue, as with the recurring rate for the 557A switchboard itself, centers upon the correctness of C & P's cost methodology. The Commission's Final Order demonstrates that it fully considered, but ultimately rejected, TAS' position. The Final Order also explains the Commission's bases for rejecting TAS' request: (1) a reduction in over-cost rates for such vertical services would necessitate increases in subsidized basic exchange rates, and (2) the overall effect on TAS of the rate was in line with that experienced by other users of vertical services. See Final Order No. 7616 at 45. This being the case, we are satisfied that the Commission adequately considered the evidence of record and explained the bases for its conclusions. We therefore affirm this aspect of the order.
TAS also contends that the increase in the monthly rate charged to answering service patrons served by a concentrator was *1122 unfair because the rate produced contributions over cost and departed from C & P's historic rating plan for concentrator-identifier equipment. TAS notes that C & P did not initially seek such a change in rating practices; instead, the change stemmed from a suggestion made during the testimony of Mr. Scott, a C & P witness. TAS therefore maintains that it received inadequate notice of the possibility of a change in the rating plan. We find these contentions unfounded.
First, there was evidence of record that contradicted TAS' calculations on the issue of alleged errors in C & P's cost methodology. Second, the Commission fully explained its reasons for departing from past rating practices. The Commission noted that the alteration, although not initially proposed by C & P, had been proposed during the proceedings in an attempt to respond to TAS' own objections to the appearance of a competitive imbalance between the rates charged to customers served by AUTOTAS concentrators and those served by 557A concentrators. See Final Order No. 7616 at 46. In order to avoid the appearance of price discrimination that might result if recurring monthly rates were charged directly to patrons served by 557A equipment but not to patrons served by AUTOTAS equipment, PSC adopted C & P's offer to restructure its rate practice, permitting the recurring rate for non-AUTOTAS concentrator connections to be charged to the telephone answering service bureaus rather than to the patrons of those bureaus. See id. at 47. The alteration in the historical rate practice, therefore, was adopted as a means of rectifying a problem that TAS itself raised. This being the case, TAS can hardly claim that it received inadequate notice or was denied the opportunity to be heard on the issue of how the problem should be remedied.

D. Direct Inward Dialing
PSC approved C & P's request for a 51% increase in the recurring rates for direct inward dialing service (DID). TAS argues that PSC erred in approving this rate because: (1) PSC failed to consider that C & P had failed to follow an AT & T recommendation that C & P restructure its DID rates, and that when this recommendation had been followed in certain other jurisdictions lower DID rates had been approved or proposed, and (2) PSC failed to consider TAS evidence which showed that in the District of Columbia, radio common carriers (RCCs) pay substantially lower rates for DID service. TAS maintains that as a result of these alleged deficiencies PSC's approval of the increase must be reversed because it is not based on reliable evidence and is discriminatory. We do not agree.
In its Final Order the Commission specifically rejected TAS' allegations of discrimination in DID rates charges between RCCs and TAS members. The Commission accepted C & P's contrary evidence on this issue, which showed that RCCs in fact do not receive the same service as TAS members, since the RCCs receive only DID numbers, whereas TAS members receive DID numbers plus terminations. See Final Order No. 7616 at 48. Thus, there was ample ground for PSC's concluding that TAS failed to show that two categories of C & P customers were paying different rates for the same service under the same circumstances. See generally Atlantic Telephone Co. v. Public Service Commission, 390 A.2d 439, 444 (D.C.1978).
The Commission did not explicitly reject TAS' other contentions, which related to DID rates in other jurisdictions. We conclude that the Commission's failure to address this point in the Order does not render the findings inadequate, since TAS failed to demonstrate how DID rates charged in other states were relevant to the cost of providing DID service in the District of Columbia. In the absence of a showing by TAS of the existence of similar conditions in the states where lower DID rates have been approved or proposed, those rates were irrelevant to the question *1123 of the reasonableness of the rates charged in the District of Columbia. See Duff v. Public Utilities Commission, 56 Ohio St. 2d 367, 371, 384 N.E. 2d 264, 269 (Ohio 1978); cf. New England Telephone & Telegraph Co. v. Public Utilities Commission, 390 A.2d 8, 38 (Me.1978); Orlosky v. Pennsylvania Public Utility Commission, 171 Pa.Super. 409, 419-20, 89 A.2d 903, 908 (1952). We therefore are satisfied that substantial evidence supports PSC's approval of the requested rate increase for DID service.

E. Installation Charges
Before entry of the rate order challenged in this appeal, C & P recovered the costs of installing 557A or 557B switchboards and related concentrators and identifiers through recurring charges imposed over the useful life of the equipment. In this rate proceeding, however, such old equipment was recognized as obsolete and was "frozen" (i.e., made unavailable) with respect to new customers. The freeze does not affect existing users of the old equipment, who can obtain additional units from C & P's inventory. Given the obsolescence of the equipment, which is expected to have a shorter-than-normal useful life, C & P sought permission to recover immediately upon installation the costs for any future installations of additional 557 equipment, thereby protecting general rate payers. TAS opposed the proposed installation charges on the grounds that they exceeded actual installation charges and would impair the ability of telephone answering service bureaus to expand and provide service. PSC agreed that C & P should be allowed to recover installation costs for the obsolete equipment more quickly, but arrived at a compromise measure designed to protect the competitive posture of TAS members. Under this compromise, PSC allowed C & P to recover immediately 50% of the costs of installing 557 equipment, with the balance to be recovered through equal monthly installments over the first 5 years of use. See Final Order No. 7616 at 46.
TAS maintains that the installation rates approved by PSC were not supported by substantial evidence because, during the hearings that were conducted in this rate case, a TAS witness testified that, in his opinion, C & P's proposed installation rates were in excess of actual installation costs. In addition, TAS maintains that the rates were not fair, just, and reasonable because they were far in excess of C & P's average imbedded investment in such equipment. Finally, TAS maintains that PSC's decision regarding installation rates was inconsistent with "precedent within C & P's [j]urisdiction" because Maryland's utility commission recently rejected a similar request by C & P on the ground that the company's installation charges should be limited to actual installation charges. We find these contentions unpersuasive.
TAS did not prove any specific defects in C & P's cost study regarding the calculation of installation costs. Instead, TAS merely presented a witness, Richard McNamara, who testified that, on the basis of his experience in the telephone answering service business, he believed the proposed rates were unrelated to the labor and materials actually involved in installing the vintage equipment. Further, Mr. McNamara testified, incorrectly, that in the past C & P had not imposed any charge for the installation of such equipment. We conclude that this testimony did not furnish a substantial basis for rejecting C & P's cost figures. Nor does TAS' assertion that the rates are unreasonable because they exceed actual imbedded costs provide a basis for rejecting C & P's calculations. That assertion is not probative of the main question, which is whether C & P correctly measured the installation costs.
TAS' reliance upon the conclusion of a neighboring state's utility commission as "precedent" is misplaced. Such decisions, while informative, are not binding on PSC, which must make independent rate determinations on the basis of the records made in District of Columbia rate proceedings. See generally New England *1124 Telephone & Telegraph, supra, 390 A.2d at 38. We therefore conclude that substantial evidence supported PSC's decision to approve the requested charges, and that the approved means of recovering those costs struck a reasonable balance between C & P's interest in recovering costs and the interests of users of vintage equipment in being able to compete and expand. Accordingly, we affirm PSC's conclusions regarding installation charges.

III. THE GSA PETITION

A. Centrex Rate Structure
From the inception of Centrex service until this rate proceeding, C & P had employed a five-step declining block rate structure for Centrex. Under this structure large users of Centrex systems paid less per line than small users of such systems. In the instant case PSC approved C & P's request to abolish the declining block rate structure and to supplant it with a uniform per line rate that applies regardless of customers' systems' sizes. GSA, C & P's largest customer for Centrex services, contends that the Commission erred in approving this change.
GSA's contentions in this regard center upon: (1) the asserted absence of substantial evidence supporting C & P's position that the declining block rate was unjustified by economies of scale; and (2) PSC's failure to give sufficient consideration to GSA's evidence that tended to demonstrate the existence of such economies of scale. After reviewing the Commission's order, the briefs, and the record, we are satisfied that there existed substantial evidence to support the Commission's decision, and that the Commission explained adequately its reasons for rejecting GSA's position.[3]
GSA presented evidence which suggested that at least some small economies of scale did exist and that other, unproven, economies of scale might exist. However, it was not necessary that the record demonstrate the absence of all economies of scale in order to justify discarding the declining block structure. Rather, the law required only that the approved rate fall within a "`zone of reasonableness.'" Permian Basin Area Rate Cases, 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968) (quoting Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 585, 62 S.Ct. 736, 742, 86 L.Ed. 1037 (1942)). Since there is record evidence which supports the Commission's conclusion that the asserted economies of scale were insufficient to justify the previous Centrex rate structure, this aspect of the order cannot be set aside on the ground that it is irrational or arbitrary.

B. Equity
The government maintains that in this ratemaking proceeding PSC impermissibly disregarded equitable considerations by placing a disproportionate share of the rate increase on those customers who, like the government, use vertical rather than monopoly services. We find this contention to be unfounded. The Commission's order fully explained that ensuring equitable treatment for different categories of customers is but one of four ratemaking goals that also include ensuring economic efficiency, fair competition, and universal service. See Final Order 7616 at 16-17. The order further explained that conflicts among the goals may arise in the course of devising a particular rate structure, and in such cases the Commission must attempt to strike a balance. See id. The Commission, therefore, can hardly be said to have failed either to identify all the factors which affected its decision, or to explain the process by which it attempted to resolve the policy conflicts that arose in the instant proceeding.[4] *1125 GSA's disagreement with the precise balance that PSC struck in what was, in essence, a policy matter does not provide an adequate basis for reversal. See, e.g., Metropolitan Washington Board of Trade v. Public Service Commission, 432 A.2d 343, 352 (D.C.1981); Goodman v. Public Service Commission, 309 A.2d 97, 101 (D.C.1973). Accordingly, we affirm this aspect of the order.

C. Marginal Costs
GSA contends that PSC erred in approving use of a marginal pricing system for vertical services. GSA's objections to the adoption of this system are two-fold. First, GSA maintains that the Commission failed adequately to explain precisely how certain marginal costs for vertical services should be calculated. Second, GSA complains that the Commission erred in adopting marginal cost calculations that substantially overstate marginal costs. Specifically, GSA maintains that the Commission adopted C & P's cost calculations by default, and that these calculations were excessive because, inter alia, they: (1) failed to take into account the fact that C & P leases both new and used equipment, with the result that when used equipment is leased C & P receives double compensation for inflation, and (2) understated the salvage values and useful lives of equipment. Because of such deficiencies, GSA argues, the Commission committed reversible error. We find neither argument persuasive.
With respect to GSA's general complaint regarding the adequacy of the Commission's explanation of how marginal costs should be calculated, we are satisfied that the instant rate order, when read in conjunction with previous telephone rate orders, provided sufficient guidance on the PSC's theory of marginal pricing. In Formal Case No. 729, for example, the previous C & P rate case, PSC discussed at length the question of cost methodology and gave C & P specific directives regarding the preparation of future cost studies. See generally Re Chesapeake & Potomac Telephone Co., supra, 43 Pub.Util.Rep. 4th at 229-43. Having provided such an explanation in a previous case, the Commission was not required in subsequent cases to "rehash its reasons for adopting basic policies." Washington Gas Light Co., supra, 450 A.2d at 1200 n.15. Rather, PSC was entitled to rely, as it apparently did here, on explanations contained in earlier orders. See id. We therefore reject GSA's contention that the instant order inadequately explained marginal pricing.
We are also persuaded that the record supports and that the Commission adequately explained its adoption of C & P's specific marginal cost calculations. The Commission's order fully explains why, in the interest of promoting competition, PSC accepted cost calculations that were based solely upon the cost of new equipment. See Final Order No. 7616 at 24-25. Thus, GSA cannot complain that the Commission overlooked or refused to consider C & P's practice of leasing both new and used equipment. Instead, the order makes clear that, as a matter of policy, the Commission *1126 determined that figures based solely upon the cost of new equipment should be employed so as to avoid giving C & P a competitive edge over other vertical market suppliers who had not yet amassed inventories of used equipment. GSA's disagreement with such a policy decision is insufficient to warrant reversal. See, e.g., Metropolitan Washington Board of Trade v. Public Service Commission, supra, 432 A.2d at 352; Goodman v. Public Service Commission, supra, 309 A.2d at 101.
In addition, during the proceedings below, GSA failed to substantiate claims made by its witnesses regarding alleged errors in C & P's calculations of salvage values and useful lives. Thus, GSA failed to supply the Commission with sufficient grounds for rejecting C & P's figures as unreasonable. There was substantial evidence in the record to support the Commission's acceptance of C & P's figures.
Based on the foregoing, we are satisfied that the Commission has explained adequately both the reasons for adopting a marginal pricing system for vertical services and the method by which it is to be applied by C & P, save for one deficiency in the explanation of how it was in fact applied in this case. We will now address that deficiency.

D. Residual Ratemaking  Local Exchange Rates
GSA asserts that the Commission order contains a basic flaw that renders incoherent its decision as to the rate increase to be assessed (1) for local exchange services, and (2) for the bulk of vertical services as well. The problem, according to GSA, is that the Commission appears to have used residual ratemaking to determine both. We agree that the Commission's order is unclear in this regard.
"Residual ratemaking" refers to the practice of allowing the increase for a particular category of service to be determined on the basis of residual costs. Residual costs equal the difference between the total approved revenue requirement and the sum of all specifically determined rate increases for other categories. In its order, the Commission said,
We have determined that decreases in the rates for local exchange services are warranted in this proceeding, but that the rate for a message unit should be reduced. Since economically efficient pricing demands that competitive vertical services produce revenues in excess of their jurisdictional embedded costs, setting local exchange rates on the basis of residual costs is, in effect, necessary, given the revenue requirement constraints of this case.
Final Order No. 7616 at 58.
Having thus stated in its discussion it would set "local exchange rates on the basis of residual costs," the Commission went on to find that the Company should be authorized to file as a rate change "[r]ates designed to produce additional revenues of $2,100,000 from local exchange service." Final Order No. 7616, Finding of Fact 1.i (p. 72). The order does not state how that figure was derived. There is no indication that it was arrived at by deducting the sum of specifically determined increases from the total approved revenue requirement. Such specifically determined increases totaled only $2.5 million of the $40.3 million additional revenue requirement.[5]
GSA argues, therefore, that the local exchange rate increase was not calculated residually. It drives the point home by pointing to another Commission finding that states that the Company should be authorized to file rate changes to produce:
The remainder of the additional revenues to which the Company is entitled from increases in rates for residential type telephones and other vertical services.
*1127 Final Order No. 7616, Finding of Fact 1.x (p. 74).
If the Commission order did what it said it did and based local exchange rates on residual costs, we are apparently presented with what GSA's brief termed the logical impossibility of setting two different rates residually. Rallying to the defense of the Commission order, Intervenor C & P explained in its brief (p. 14) that local exchange rates were indeed set residually. C & P discounted the fact that the Commission announced the specific amount so calculated at a point in the order before its announcement of vertical service rates. The utility's brief went on to explain that "simple arithmetic . . . indicates that after accounting for these cost-related increases and the other rate changes enumerated in its order, exchange rates had to be increased by the $2.1 million ordered by the Commission to satisfy the Company's $40.3 million revenue requirement."
The Commission itself, however, did not attempt to defend the statement in its order that local exchange rates were being set "on the basis of residual costs." Instead, it acknowledged in its brief (p. 30) that "[s]o-called residual ratemaking was not used here [in setting local exchange rates] because of the profound impact of the revenue requirement constraints on rate design aspects of this case and for independent policy reasons." (Emphasis supplied.) The Commission's brief went on to explain that the decision to lower the message unit rate required a counterbalancing increase in the monthly local exchange rate. The Commission brief (p. 31) responded to the GSA objection to the lack of explanation of how the specific figure of $2.1 million was calculated by observing that C & P's subsequent filing of tariff pages in compliance with its order reviewed here supplied the actual numbers.
We find the Commission's explanation lacking. The Commission did not have before it the specific numbers of the compliance filing at the time it reached the $2.1 million figure for the local exchange increase. Its brief contradicts it order, and the regulated utility's understanding of how the local exchange rate was set differs from the explanation advanced in the Commission's brief.
While our review of Commission orders is limited in scope, it is not so deferential that we can approve an order that is unclear and apparently self-contradictory. As we stated in Washington Public Interest Organization v. Public Service Commission, 393 A.2d 71, 76-77 (D.C. 1978), cert. denied, 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979):
Absent precise explanation of methodology as applied to the facts of the case, there is no way for a court to tell whether the Commission, however expert, has been arbitrary or unreasonable.
We remand the record to enable the Commission to prepare a further order that will explain its use of residual ratemaking in these proceedings. The order shall clarify the extent to which residual ratemaking was used, if at all, to arrive at the rate increases for local exchanges and those vertical services not specifically treated in the order. The Commission may conduct such further proceedings, if any, as it deems appropriate to comply with the foregoing. Accordingly,
The record of these proceedings is remanded to the Commission for the preparation of a further order in compliance with this opinion, but the Commission's order is in all other respects affirmed.
NOTES
[1] GSA was an intervenor in the proceedings before the Commission. The United States petitioned in GSA's behalf for review of Final Order No. 7616. We will refer to that petitioner as GSA.
[2] The revenue requirements phase of the case terminated in Final Order No. 7546. The United States, in behalf of GSA, petitioned for review of that order and Final Order No. 7603. In Final Order No. 7603, the government's petition for reconsideration of Final Order No. 7546 was denied. In United States v. Public Service Commission, 465 A.2d 829 (D.C.1983), a different division of this court affirmed both orders.
[3] The Commission explained that it was particularly persuaded by C & P's evidence that there were no economies of scale with respect to office equipment in Centrex systems with over 900 lines. Every GSA Centrex system except one has more than 900 lines. The Commission's analysis of the evidence on this issue is in Final Order 7616 at 34-38.
[4] It should be noted that considerations of equity led the Commission to resolve at least one issue, Centrex rates, substantially in GSA's favor. In explaining its decision to approve only 25% of the requested increase for Centrex rates, PSC noted:

Our decision to permit an increase in Centrex revenues substantially smaller than that which the Company seeks is based on the unusual circumstances of this case. In reviewing the record, we became concerned that the federal government, as the largest single consumer of the Company's offerings in the District of Columbia, might bear a disproportionate share of the revenue burden we are imposing if we were to treat Centrex similarly to all the Company's vertical services and permit them to be priced on the basis of their prospective costs. Because of the revenue requirement constraints in this case, it is reasonable, in our view, to ameliorate this impact by permitting a relatively modest increase in Centrex revenues. We wish to stress, however, that, absent such an unusual revenue restraint, the rates we would have allowed would be substantially higher.
Final Order No. 7616 at 41-42 (footnote omitted; emphasis added).
[5] In addition to the increases specifically stated, the final order approves several other less significant increases for which no dollar amount is given.